ARMED SERVICES BOARD OF CONTRACT APPEALS

Appeal of --                                  )
                                              )
GSC Construction, Inc.                        )        ASBCA No. 61380
                                              )
Under Contract No. W912HN-10-D-0049           )
  Task Order 0007                             )

APPEARANCE FOR THE APPELLANT:          Mr. George L. McKnight
                                         President

APPEARANCES FOR THE GOVERNMENT:        Michael P. Goodman, Esq.
                                         Engineer Chief Trial Attorney
                                       Laura J. Arnett, Esq.
                                         Engineer Trial Attorney
                                         U.S. Army Engineer District, Savannah

OPINION BY ADMINISTRATIVE JUDGE MCNULTY

       Before us is the government's motion for summary judgment. We partially
grant the motion.

STATEMENT OF FACTS (SOF) FOR PURPOSES OF THE MOTION

       1.  On September 25, 2012, the U.S. Army Engineer District Savannah
(government) issued Task Order (TO) 0007 to GSC Construction, Inc. (GSC or
appellant) under an indefinite-delivery, indefinite-quantity multiple award task order
contract (MATOC), Contract No. W912HN-10-D-0049 for the design and renovation
of an Army Ranger barracks building, Building 2833, located at Fort Benning, Georgia.
The task order included options relating to design and renovation services for Building
2834 as well.  The barracks buildings are also referred to as the "Rip Rope" buildings.
The task order established a 540 calendar day period of performance measured from the
date of receipt of Notice to Proceed (NTP).  (R4, tab 6 at 1-5)

       2.  GSC acknowledged receiving the NTP on November 21, 2012, thereby
establishing the task order's completion date as May 15, 2014 (R4, tab 2 at 2, 7).

       3.  Under date of January 25, 2013, the government requested a proposal (RFP)
for additional work due to design changes at Building 2833 (R4, tab 8 at 1).  GSC's
proposal submitted in response to the RFP included two fragnet schedules setting forth
the anticipated impact on the project's schedule if the government went ahead with the
additional work (id. at 20-21).  GSC's proposal in the total amount of $59,781.11,

included a request that 22 days be added to the schedule with a cost of $18,999.42 for the additional time of performance required, i.e., extended overhead[1] (*id*. at 6).

4. The government accepted GSC's proposal and issued Modification No. 1A to the TO in the amount of $59,781.11, but rather than the 22 days requested, granted 30 days of time extension. The modification expressly states that it is for all costs directly or indirectly attributable to the changes and delays related thereto including extended overhead (R4, tab 8 at 25-27). In this regard the modification stated:

> It is understood and agreed that pursuant to the above, the contract time is extended the number of calendar days stated, and the contract price is increased as indicated above, which reflects all credits due the Government and all debits due the Contractor. It is further understood and agreed that this adjustment constitutes compensation in full on behalf of the Contractor and its Subcontractors and Suppliers for all costs and markups directly or indirectly attributable for the change ordered, for all delays related thereto, for all extended overhead costs, and for performance of the change within the time frame stated.

(*Id.* at 26-27) GSC signed the modification on February 22, 2013 (*id*. at 25). The government's Price Negotiation Memorandum (PNM) states that the basis for the time extension was that design was delayed 30 calendar days by the government's failure to provide as-built drawings to GSC in a timely manner (*id*. at 23). Modification No. 1A extended the contract completion date to June 14, 2014 (*id*. at 26).

5. By letter dated May 9, 2013, GSC submitted a letter regarding the progressive collapse requirements of the contract. GSC stated the as-built drawings had not been made available until sometime after contract award. This had caused a delay to the design work, which had been addressed in a modification to the contract. (R4, tab 17 at 1) GSC also stated that without the as-built drawings its bid price had been based on a proposal it had received from Fibrwrap Construction, which had relied on its prior experience with Buildings 2752 and 2754 to prepare the proposal. GSC continued, stating they had discovered that much more work was required in the Rip Rope buildings than had been required for Buildings 2752 and 2754. (*Id*.) GSC stated it hoped the progressive collapse requirement would be withdrawn from the contract, which would result in a credit to the government, otherwise, GSC would submit a

---

[1] The proposal indicates GSC added Overhead (10%, $1,899.94), Profit (7%, $1,329.96) and Bond premium (1%, $189.99) to its proposed costs (*id*. at 6). Accordingly, with respect to the extended overhead GSC was seeking, and ultimately received, $22,419.31 ($18, 999.42 + $1,899.94 + $1,329.96 + $189.99) (SOF ¶ 4).

2

request for equitable adjustment (REA) of approximately $200,000 for building 2833 alone (*id*. at 2).

6. GSC reiterated that it had received a modification for the delay associated with the government's election to not provide the Rip Rope buildings as-built drawings until several months after contract award in its claim submitted May 29, 2013 (*id*. at 15). Its claim sought costs associated with the additional reinforcement required in Building 2833. The claim did not seek any additional time or any time or costs for work in Building 2834. (*Id*. at 15-16)

7. By letter dated July 29, 2013, GSC notified the government it had encountered what it considered to be differing site conditions (DSC). The letter indicated the concrete slabs for Building 2833's floors were out of plumb with each other and that the slabs exceeded the flatness tolerance set forth in the contract. (R4, tab 22 at 1) GSC included a cost proposal, totaling $158,921.72 for the two DSC. The cost proposal indicated that 2,400 bags of floor leveling compound was needed to correct the slab flatness issue. The cost proposal also indicated that a 25-day time extension was needed to perform the required corrective work. (*Id*. at 2)

8. The government exercised options 1-3 and added the work to TO 007 by Modification No. 02, effective August 13, 2013 (R4, tab 10 at 1). The modification added 175 calendar days to the task order performance period, extending it to December 6, 2014 (*id.* at 2-3). Although the modification was unilateral, GSC does not dispute that the contract completion date was revised to December 6, 2014, by Modification No. 02 (gov't mot. at 2; app. opp'n at 2).

9. Under date of August 14, 2013, the government sent GSC a RFP for removing and replacing a sanitary line and for the work related to alter the metal stud framing to account for the edges of each slab being out of plumb (R4, tab 23 at 1, 3). GSC submitted a proposal totaling $87,627.67 and requested a 15-day time extension in response to the RFP (*id*. at 5). The proposal included furring out all slab edges to make them plumb in the amount of $25,141.00 before markups (*id*.). GSC also submitted a fragnet schedule to support its request for a 15-day time extension (*id*. at 13-14). The parties agreed to a no time change order in the amount of $73,637.52 for the work, which was added to the TO by Modification No. 1C (*id*. at 16-17).

10. By letter dated September 26, 2013, the government requested a proposal from GSC for the additional reinforcing work relating to the progressive collapse requirements for both of the Rip Rope buildings (R4, tab 24 at 1-3). GSC's proposal in the total amount of $499,931.60 included $81,530.50 before markups for leveling the floor slabs, which was based on 1,304 bags of leveling compound (*id*. at 5, 20). During the negotiations of the modification relating to this work, GSC, at the government's request, agreed to remove the costs associated with the floor leveling

3

(*id.* at 31-32). Bilateral Modification No. 04 was executed by the parties on May 15, 2014, for the additional work associated with the additional reinforcing required to comply with the progressive collapse requirement (*id*. at 34). The government's PNM indicates the floor leveling work associated with Modification No. 04 was required due to the increased amount of fiberwrap applied to the slabs to satisfy the progressive collapse requirements. (*id.* at 30-31).

11. By letter dated February 10, 2015, the contracting officer notified GSC that it had failed to complete the project by the contract's completion date and that the government would assess liquidated damages in the amount of $1,029.64 per calendar day assessed retroactively from February 5, 2015, until the buildings were turned over[2] (R4, tab 34). The government conducted the final inspection of building 2834 and granted occupancy to the user on June 19, 2015 (R4, tab 19 at 879).[3]

12. By letter dated March 3, 2015, the government requested a proposal for changes to the fire alarm system. GSC submitted a proposal in the amount of $8,393.90 with a 70 calendar day time extension in response. (R4, tab 25 at 1, 5) The government issued Modification No. 1G in the amount of $8,393.90 as proposed by GSC on March 6, 2015 (*id*. at 14). The modification was issued unilaterally because the parties could not agree on the time required to perform the additional work (*id*. at 11-13). The modification was issued with the understanding that the issue of time would be revisited (*id*. at 15-16). Subsequently, the government issued Modification No. 1H granting a 10-day non-compensatory time extension for the changes to the fire alarm system (R4, tab 26). This modification was also issued unilaterally. GSC declined to sign it and indicated it would provide "a more formal response later in the week" (*id.* at 3). The record includes a response to a request from the government made in January 2018 for GSC's delay analysis relating to the fire alarm changes (R4, tab 16). The response, signed by Mr. Jay Grant from GSC discussed the attached schedules, which Mr. Grant asserts demonstrates that the fire alarm system changes had an impact of 71 calendar days to the overall schedule (*id.* at 25-39). A comparison of the two schedules, found at 26-32 and 33-39 of tab 16 indicates that an activity identified as "1G" and named "Fire Alarm Changes" has been added to the amended

---

[2] Building 2833 had been made available for the government's use on November 18, 2014, despite the HVAC system not operating properly (R4, tab 19 at 672). The contract does not have separate completion dates for the buildings, a single completion date encompasses both buildings (R4, tab 6 at 5, tab 10).

[3] In its motion the government asserts it is undisputed the warranty period commenced on June 19, 2015 (gov't mot. at 23). GSC disputed this in its response, asserting Building 2834 was substantially complete in May and that the government occupied the building on May 11, 2015 (app. opp'n at 12). The government has admitted the project was substantially completed on May 8, 2015, for purposes of the motion (gov't reply at 15).

4

schedule.  The activity is depicted as extending from early March to mid-May.  No further explanation was provided.

13.  On March 5, 2016, a two-inch water line came apart.  Building 2834 was flooded with four inches of water in the basement.  The base maintenance contractor responded to the flood and also noted that a six-inch water main on the first floor was leaking badly and contributed to the flooding.  (R4, tab 29)  The repairs were completed on March 10, 2016 (*id.* at 2).

14.  On March 31, 2016, another leak occurred in Building 2834 and GSC was asked to make the necessary repairs.  GSC, through a subcontractor, repaired this leak on April 2, 2016.  On April 3, 2016, the repair failed and the basement was flooded with six feet of water and other areas of the building were flooded with as much as two feet of water.  GSC was again directed by the government to make the necessary repairs under the warranty it had provided.  (R4, tab 30)

15.  By letter dated April 11, 2016, GSC advised the government that it was continuing to assess the cause of the leaking and that it was working to assure the government received fully functional items.  GSC indicated that its insurance company was involved in reviewing the situation.  (R4, tab 32)

16.  In July 2016, GSC's insurance company, BITCO, issued a check in the amount of $110,000 to GSC as an advance payment for certain repairs relating to the flooding.  The check was issued as an accommodation and BITCO reserved all of its rights, including the right to seek reimbursement of the payment.  (R4, tab 33)

17.  Under date of July 26, 2017, GSC submitted a certified claim to the contracting officer for final decision (R4, tab 14).  The claim included seven "Issues" totaling $1,339,954.11 as follows:

> 1) Delay in start of Bldg. 2834 due to a failure to provide as-built drawings for existing 2833 Building that was outside the power of GSC.  GSC requested a thirty (30) calendar day time extension and $20,519.37 in extended overhead by letter dated January 11, 2013.[4]

---

[4] GSC appears to have misstated the date of the letter.  The letter enclosed with the claim in the record is dated January 31, 2013 (R4, tab 14 at 4).  The letter includes a cost proposal showing how the cost claimed was calculated and two fragnets supporting the 30 days claimed (*id.* at 5, 7-8).  The fragnets are identical to the fragnets submitted by GSC to support the request for an equitable adjustment that was paid in Modification No. 1A (*Cf.* R4, tab 14 at 7-8, tab 8 at 20-21).

5

2) Audio Visual Changes. GSC was directed by the user to make changes to the audio visual components of 2834 in order for 2834 to be accepted. These changes were outside GSC's scope. For these changes, GSC requests a $29,689.25 change order per the attached cost breakdown from Net Planner and a 21 calendar day time extension with extended overhead.

3) Testing outside GSC's scope. GSC requests a $632,995.61 change order for GSC having to maintain and perform testing not required by its contract. This cost is substantiated by the partial judgement award, Judge Proper January 18, 2016, to GSC for completing HVAC system once DYNAMIC was unable to complete. This unduly imposed requirement caused substantial hardship to GSC and its subcontractors. The HVAC contractor abandoned the project and ceased doing business in Georgia as a direct result. Attached is an uncollectable judgment against the project's mechanical contractor justifying the change order amount. GSC had to complete the project acquiring outside forces as no others would take the job due to excessive and previously unknown requirements. GSC was further burdened by the 120 days these requirements added to project completion. GSC is entitled to a change order because its losses caused by the testing requirements were outside its control and unknown at the time GSC entered into its contract.

4) Existing concrete pads were out over 1" level contrary to expected building standards. This unforeseen condition forced GSC to install an additional 2400 bags of Ardex at a spread rate of 25 sf per bag. GSC requests a change order for $158,921.72 per GSC letter dated July 29, 2013.

5) COE issued unilateral 1G "Fire Alarm Changes." GSC request a 70 day time extension with overhead as requested by GSC backup dated March 4, 2015. The unilateral was ambiguous but COE took position that it required GSC to meet all base requirements for life safety. This resulted in confusion loss of efficiency and additional delays to the

project. Please see attached change order. GSC requests a change order for 70 day time with extended overhead.[5]

6) Basement Flood. GSC was directed to repair a leak to 2834's hot water heater. GSC also repaired damages caused by the leak at the user's direction, even though the leak was not GSC's fault, there were damages from previous leaks, and the project exceeded the warranty period. GSC requests to be reimbursed for the expenses incurred in repairing the leak, including its increase insurance premium. Please see attached cost breakdown estimate including premium increase for damages totaling $394,750.68.[6]

7) GSC is requesting payment of outstanding balance of original contract construction costs in the amount of $103,077.48. At our expense GSC allowed beneficial occupancy of 2833 well before the completion date. This resulted in GSC having to maintain 2833 until 2834 was occupied by COE.

(R4, tab 14 at 1-2) The amount claimed for Issue (4) included costs for work associated with both leveling the floor slabs and installing furring along the slab edge (*id*. at 18). The pricing, in the amount of $5,506.00, for the furring work was obtained from Center Brothers, Inc. via an email dated July 26, 2013 (*id*. at 26). Center Brothers, Inc. subsequently revised the pricing and incorporated it into the price that GSC submitted as part of the backup for its REA that resulted in Modification No. 1C (R4, tab 23 at 11; *see also* SOF ¶ 9).

18. As part of its support of its claim GSC submitted a copy of a judgment in the amount of $632,995.61, plus costs and attorney's fees it had received in the Superior Court of Richmond County, Georgia against its subcontractor, Chris Leiser

---

[5] The claim stated no dollar amount for the extended overhead sought.

[6] This claim Issue was supported with a "Cost Estimate Analysis" breakdown, which included a lump sum for the flood repairs in the amount of $303,740.23 and $22,500 for the insurance premium increase before markups of 10% each for overhead and profit and 1% for additional bond premium (R4, tab 14 at 33). We find the total amount claimed for the increase in insurance premium element with the markups as claimed is $27,497.25. Although there were multiple leak incidents between March and April 2016 appellant's claim does not segregate the costs by incident. (SOF ¶¶ 13-14; R4, tab 14 at 33-34)

d/b/a Dynamix Mechanical[7] (*id.* at 12-13). The record includes a copy of the complaint filed by GSC against Dynamix, which pleads Dynamix breached the subcontract by abandoning performance prior to its completion, requiring GSC to engage a replacement subcontractor to complete the work contained within the scope of the subcontract agreement and damaging GSC in the amount of $632,995.61 (R4, tab 20 at 4). On August 22, 2017, the contracting officer notified GSC that a decision on its claim would be issued by February 15, 2018 (R4, tab 15). On October 25, 2017, appellant filed a Notice of Appeal with the Board, which was docketed as ASBCA No. 61380.

19. By letter dated February 15, 2018, the contracting officer partially found merit and partially denied the claim as synopsized below:

> (1) The contracting officer denied the first issue, finding GSC had already been compensated in the form of a 30-day time extension and payment of $20,519.37 via Modification No. 1A[8] (R4, tab 2 at 3-5; SOF ¶¶ 3, 4).
>
> (2) The contracting officer found the second issue had some merit, finding GSC was entitled to compensation for additional direct costs it had incurred and a non-compensable 21 calendar day time extension (R4, tab 2 at 5-7).
>
> (3) The contracting officer denied the third issue, finding the costs claimed, duplicated the amount of a judgment GSC had received in a lawsuit against its subcontractor, DYNAMIC, for having failed to perform work that GSC had pleaded in its complaint against the subcontractor was "within the scope of the subcontract" and that GSC had provided no explanation for how the government should and could be responsible for the subcontractor's default (*id.* at 7-9).

---

[7] The record includes references to a GSC subcontractor named DYNAMIC as well. Based on GSC's assertions in its claim we find that Dynamix Mechanical and DYNAMIC are one and the same.

[8] The record indicates GSC was actually paid $22,419.31 for extended overhead by Modification No. 1A (SOF ¶¶ 3-4). We find the contracting officer conflated the amount paid in Modification No. 1A with the amount claimed in 2017, which deleted 10% for overhead, which had been claimed and paid in 2013. (*Id.*; R4, tab 14 at 5)

8

(4) The contracting officer denied this issue as well (*id.* at 9-12). First, the contracting officer found that the furring along the slab edge work had been paid for under Modification No. 1C., and with respect to the floor leveling work, found that this work had been paid for under Modification No. 04. (*Id.* at 11-12; *see also* SOF ¶ 10) The contracting officer stated that GSC had failed to provide any evidence that the work being claimed for differed from the work that had been paid for previously under the two modifications (*id.*).

(5) The contracting officer denied this issue also. The contracting officer noted that 10 calendar days had been granted for the fire alarm changes under unilateral Modification No. 1H. The contracting officer found that the fragnet submitted in support of the claim showed the fire alarm work would not be finished until the middle of May 2015 but that GSC's own QCR's (Quality Control Report) showed the work was completed no later than March 20, 2015.[9] The contracting officer also found that the claim failed to take into account the 10 calendar day time extension that had been granted under Modification No. 1H. (*Id.* at 12-15)

(6) The contracting officer denied this issue, finding GSC's poor workmanship was the root cause of the flooding. Additionally, the contracting officer found GSC had submitted no backup to support the claimed insurance premium increase. (*Id.* at 16-22)

(7) The contracting officer denied this issue finding the government was entitled to $127,675.36 due to GSC's late finish. The contracting officer found this amount should be reduced by $21,622.44 to account for the 21 day time extension the contracting officer found was due GSC for the audiovisual changes, claim sub-item (2), but that even with this reduction the amount of liquidated damages due the government ($106,052.92) exceeded the unpaid contract price balance. (*Id.* at 22-24)

---

[9] The record includes the Quality Control Reports relied on by the contracting officer (R4, tab 18).

20. In its complaint GSC reiterated the same seven issues set out in its claim and sought relief totaling $1,339,954.11, exactly matching the amount claimed (compl. ¶¶ 18, 29; SOF ¶ 18).

21. In its response to the government's motion for summary judgment, GSC withdrew its claim for insurance premium increases, which was part of Issue 6 (app. opp'n at 14; SOF ¶ 18).

22. Additionally, after the government filed its motion, GSC produced a settlement agreement between itself and its insurance company (gov't reply at 13, ex. 5). The settlement agreement establishes that GSC received $310,000 from its insurance company as a loan for payment of the repairs required to remediate the damage caused due to the flooding in building 2834 (gov't reply, ex. 5). Pursuant to the terms of the settlement agreement GSC is not obligated to repay the loan unless and to the extent GSC recovers from Roto-Rooter or any other third person (gov't reply, ex. 5 at 3).

## CONTENTIONS OF THE PARTIES

The government argues appellant has been compensated for much of its claim through bilateral modifications to the contract and thus the claim items paid for through the modifications are barred by accord and satisfaction. This argument is made with respect to Claim Item Nos. 1, 4, 5 (gov't mot. at 30, 34, 37). The government argues appellant has failed to state a claim for which relief may be granted with respect to Issue 3 (*id*. at 32). With respect to Issue 6, the government argues appellant caused the flooding, which necessitated the repairs appellant asserts are additional work and that in any event appellant has been compensated by its insurance company for the repair costs appellant incurred (*id*. at 40). The government argues it is entitled to summary judgment with respect to the claim for the contract balance because appellant owes the government liquidated damages that exceed the contract balance (*id*. at 42). With respect to Issue 2, the government acknowledges the claim is partially meritorious (*id*. at 32).

Appellant opposes the motion, arguing there are material facts in dispute. Appellant argues responsibility for the flooding in Building 2834 is disputed. Appellant also argues that whether the modifications fully resolved the flooring and drawing issues is disputed, as well as the issue of whether appellant is entitled to additional time for the added fire alarm work. Appellant further argues there is a dispute with respect to whether the government is liable for increased costs related to enhance commissioning (app. opp'n at 23-25).

DECISION

GSC's withdrawal of the part of its claim, included in Issue 6, relating to the insurance premium increases, deprives the Board of jurisdiction to consider this part of the appeal further (SOF ¶ 22). This part of the appeal is dismissed as moot. *Sygnetics, Inc.*, ASBCA No. 60357, 18-1 BCA ¶ 37,160; *Advanced Powder Solutions, Inc.*, ASBCA No. 61818, 19-1 BCA ¶ 37,425 at 181,897. Accordingly, we consider the remaining issues pertaining to the government's motion.

Summary judgment is appropriate where there is no genuine dispute as to any material fact and the movant has made a prima facie showing with evidence that it is entitled to judgment as a matter of law. *Enzo Biochem, Inc. v. Applera Corp.*, 599 F.3d 1325, 1337 (Fed. Cir. 2010). *See also Mingus Constructors, Inc. v. U.S.*, 812 F.2d 1387, 1390 (Fed. Cir. 1987); *Arko Executive Services, Inc. v. U.S.*, 553 F.3d 1375, 1378 (Fed. Cir. 2009); FED. R. CIV. P. 56(a). A material fact is one that might affect the outcome of an appeal. *Revenge Advanced Composites*, ASBCA No. 57111, 11-1 BCA ¶ 34,698 at 170,883 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). An issue of material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Wavetronix v. EIS Elec. Integrated Sys.*, 573 F. 3d 1343, 1354 (Fed. Cir. 2009) (citing *Anderson*, 477 U.S. at 248). The moving party "bears the initial responsibility of informing the . . . court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact," upon which the burden shifts to the nonmoving party to "make a showing sufficient to establish the existence of [elements] essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The nonmoving party's failure to show an element essential to its case on which it has the burden of proof renders all other facts immaterial and entitles the moving party to summary judgment. *Id.* (citing *Anderson*, 477 U.S. at 250). We draw all justifiable inferences in favor of the nonmoving party. *CI², Inc.*, ASBCA Nos. 56257, 56337, 11-2 BCA ¶ 34,823 at 171,353 (citing *M. Maropakis Carpentry, Inc. v. U.S.*, 609 F.3d 1323, 1327 (Fed. Cir. 2010)). "The party opposing summary judgment must show an evidentiary conflict on the record; mere denials or conclusory statements are not sufficient." *Mingus Constructors*, 812 F.2d at 1390-91; *see also Barmag Barmer Maschinefabrik AG v. Murata Machinery, Ltd.*, 731 F.2d 831, 835-36 (Fed. Cir. 1984) ("With respect to whether there is a genuine issue, the court may not simply accept a party's statement that a fact is challenged"). Any fact that is not properly disputed we may consider to be admitted. *See Rules of the Armed Services Board of Contract Appeals*, Rule 7(c)(2), "The Board may accept a fact properly proposed and supported by one party as undisputed, unless the opposing party properly responds and establishes that it is in

dispute." *See also Ferguson Propeller, Inc. v. U.S.*, 59 Fed. Cl. 51, 58 (2003) ("Having failed to specifically dispute the Defendant's Proposed Findings of Uncontroverted Facts, the court deems those facts admitted . . ."); FED. R. CIV. P. 56(e)(2). Additionally, the Board has discretion to grant partial summary judgment to resolve some, but not all, of the issues raised by the moving party. *See, e.g.*, *Arctic Corner, Inc.*, ASBCA No. 33347, 92-3 BCA ¶ 25,030 (granting summary judgment with regard to 7 of 19 claim items); *Hermes Consol., Inc. D/B/A Wyoming Refining Co.*, ASBCA Nos. 52308, 52309, 02-1 BCA ¶ 31,767 (granting partial summary judgment on Count I with respect to the measure of recovery for unrecovered termination costs and granting summary judgment on Counts II-IV).

The government asserts there are no genuine disputes as to any material facts. For the most part, we agree with the government but disagree in a few instances as set forth more fully below. The government's motion sets forth a detailed statement of facts comprising 175 separate paragraphs. Appellant admits 77 of them without exception.[10] Appellant admits another 36 but provides additional information, which we find fails to dispute the facts asserted and relied on, by the government.[11] The remaining 62 are denied, but generally in ways insufficient to establish that a dispute actually exists.

Issue 1: Delay due to lack of as-built drawings

Appellant argues there are two issues with the as-built drawings, one relating to floor drawings, the other progressive collapse and that Modification 1A only resolved the floor drawing issue (SUMF ¶¶ 20, 22, 28-31, 36).[12] Appellant principally relies on the deposition of John Phillips in support of its assertions in this regard. However, the deposition transcript cited, ex. 2, is not in the record. Ex. 2 to appellant's brief is a series of Contractor Quality Control Reports. There is an Appendix B to the government's brief, which includes excerpts from Mr. Phillips' deposition, but does not include the pages cited by appellant. We find that appellant has failed to properly dispute the facts asserted by the government with respect to this issue. In any event, the record establishes that with respect to this sub-claim appellant has received all of

---

[10] Statement of Undisputed Material Facts (SUMF) ¶¶ 1-5, 7-8, 10-16, 18-19, 21, 32, 66, 73, 75-80, 88, 90-91, 96, 98-99, 102-106, 108-109, 114-116, 118, 122-133, 136, 142-146, 150, 152, 156, 158-166, 170-171, 173, and 175 (gov't mot. at 1-28; app. opp'n at 1-15).

[11] SUMF ¶¶ 20, 22, 24-27, 36, 67, 69, 71-72, 74, 81, 87, 89, 92-95, 97, 110, 112, 117, 119-121, 135, 138-141, 147-149, 151, 169 (gov't mot. at 4-28; app. opp'n at 4-15).

[12] Appellant's opposition addresses each of the 175 paragraphs of facts set forth in the government's motion. Most of its argument is set forth in its responses to the government's statement of facts. Rather than cite to page numbers in appellant's brief, we cite the SUMF paragraph numbers.

the dollars and time claimed (SOF ¶¶ 3-4, 17(1), 19(1)).  Appellant has failed to dispute these facts.  Furthermore, appellant has failed to explain how having received all the time and money it claimed with respect to this part of its claim there is anything left to possibly dispute.  Accordingly, we grant the government's motion with respect to Issue No. 1.

Issue 2:  Audio Visual Changes in Building 2834

Although the government seeks full summary judgment against the entirety of appellant's claim, the government's motion includes no facts relating to this issue.  The government admits the claim is at least partially meritorious and states the government is in the process of issuing a modification for it (gov't mot. at 32, 43).  The government has provided no further information regarding whether it has issued a modification for this claimed additional work and if so, whether appellant has accepted same as full compensation for this issue.  We find the government has failed to meet its burden of proof with respect to Issue 2.  Accordingly, we deny the government's motion as it pertains to this issue.

Issue 3:  HVAC Testing

Appellant summarily denied all of the facts asserted by the government relating to this issue, SUMF ¶¶ 38-65, asserting they were irrelevant without any further explanation.  Appellant asserted the facts relevant to this issue were provided in its counter-statement of facts but failed to actually identify any facts, leaving the citation blank (app. opp'n at 7).  The government argues, based on documents in the record, that appellant failed to state a claim because although appellant asserts it was required to perform work outside the scope of the contract, appellant has provided no documents to support the amount claimed, a default judgment against a subcontractor, in which action appellant pleaded the subcontractor had breached its contract with appellant by failing to perform contractually required work (gov't mot. at 33).  The government argues both of these propositions cannot be true.  We find appellant has failed to properly dispute the facts asserted by the government, which are sufficient to establish appellant has failed to state a claim against the government and grant the government's motion with respect to this issue (gov't mot. at 33; SOF ¶¶ 17(3), 19(3)).

Issue 4:  Unforeseen condition regarding levelness of concrete pads

SUMF ¶¶ 66-101 relates to this issue (gov't mot. at 11-17).  This claimed item involves two issues, additional furring work required to bring the slabs' edges into vertical alignment and the installation of Ardex floor leveling compound to make the

slabs acceptably flat[13] (SOF ¶¶ 7, 17(4)).  The government argues, it is undisputed that both issues have been resolved by bilateral Modifications Nos. 1C and 04 (gov't mot. at 34-37).  Appellant argues the modifications did not resolve all of the issues, but provides little to dispute the facts asserted by the government, other than this conclusory argument.  Appellant either admits SUMF ¶¶ 66-78, which relate to the furring issue only or adds additional information stating two issues, furring, and floor levelness were involved or that it had not seen the government's PNM relating to Modification No. 1C (app. opp'n, SUMF ¶¶ 66-78).  We find appellant has not properly disputed the facts asserted by the government relating to the furring issue, which are supported by documents in the record.  Accordingly, we grant the government's motion with respect to the furring issue.

The flooring issue is another matter.  Although not articulated very well, we understand appellant is arguing there are two slab levelness issues.  One arising from the progressive collapse requirements due to the application of fiberwrap material to the slabs in some locations and a general levelness issue that may be unrelated to the use of fiberwrap.  We understand appellant attempts to articulate this where it states in response to several of the facts relied on by the government:  "there was a broader issue of floor levelness beyond the corridors and bays addressed in Modification No. 04.  See Phillips Dep. Tr. at 67, lines 5-18," or words to that effect.  (App. opp'n, SUMF ¶ 81; *see also* ¶¶ 82-89)  The record, however, does not include the part of Mr. Phillip's transcript that appellant cites.  The only transcript of Mr. Phillip's deposition in the record is found in Appendix B to the government's motion.  Appendix B includes only excerpts of Mr. Phillips' deposition transcript and it does not include the pages cited by appellant.  In many, if not most, instances the failure to include cited transcript pages in the record could lead to a finding that the non-movant has failed to properly dispute the facts asserted by the movant and a ruling in the movant's favor.  However, we find the record does include sufficient evidence for us to conclude that there may be two separate issues relating to slab levelness (SOF ¶¶ 7, 10).  When appellant first raised the slab levelness issue in July 2013, there was no mention of progressive collapse and fiberwrap material being the reason why the slabs needed to be levelled.  Instead, this appears to be an issue arising from the previous construction of the slabs out of tolerance as specified by the American Concrete Institute (ACI).  The leveling of the slabs that is addressed in Modification No. 04 is specifically stated to be attributable to the application of fiberwrap, something that is possibly independent and apart from the levelness issue that was initially raised by appellant in July 2013.  While appellant has not disputed the government's factual assertions as nicely as we would have preferred, we find the record on the issue of slab levelness is sufficiently clouded that the better course in the circumstances is to exercise our discretion to hold a hearing on this issue.  *See S.C. Public Serv. Auth.*,

---

[13] Although the Issue 4 narrative appears to describe only the floor leveling work, the July 29, 2013 letter cited in support of the claim involves both issues (SOF ¶ 7).

14

ASBCA No. 53701, 04-2 BCA ¶ 32,651 at 161,601 citing *Anderson*, 477 U.S. at 255, *Blue Cross and Blue Shield Assoc.*, ASBCA No. 53632, 04-1 BCA ¶ 32,413 at 160,447. Accordingly, we deny the government's motion as it relates to the slab levelness issue of appellant's claim.

Issue 5: 70-day time extension due to fire alarm changes

GSC seeks a time extension and potentially, the associated, but unquantified, extended overhead costs arising from changes made to the fire alarm system.[14] The government recognized the original claim had merit, but the parties were not able to agree on the amount of time involved in performing the additional work. Consequently, the government issued two unilateral modifications, Modification Nos. 1G and 1H, for this additional work (SOF ¶ 12). The parties were able to agree on the costs for the additional work, which were paid under Modification No. 1G. After the work was performed the government recognized and granted appellant a 10-day non-compensatory time extension for performing the work (*id*.). The government seeks summary judgment, arguing appellant cannot establish entitlement and that appellant has been fully compensated by the two modifications (gov't mot. at 37-38). The government asserts appellant has arbitrarily selected a 50-day activity that it inserted into its schedule to establish the 70 calendar day time extension it seeks and that documents in the record indicate the additional work took much less time to perform than the time claimed (gov't mot. at 38-40). The government also argues the deposition testimony of appellant's accountant undercuts appellant's claim (*id*.).

This issue involves SUMF ¶¶ 102-122. We find that if the facts as asserted by the government were taken to be true that they would defeat appellant's claim for extended overhead and a time extension beyond that already granted by Modification No. 1H. Appellant admitted, without any exception, 12 of these facts. Appellant only denied three of the government's factual assertions, SUMF ¶¶ 107, 111 and 113. Appellant admitted but added additional information to the remaining six paragraphs, which failed to dispute the facts asserted by the government. Although the fact that appellant refused to execute the modifications because it disagreed with the government's assessment of the time required to perform the additional work would appear to at least superficially establish that a dispute exists regarding the facts associated with this issue. An examination of the assertions with respect to the SUMF appellant has ostensibly disputed reveals appellant has failed to dispute the facts asserted by the government.

---

[14] It is not clear from the record before us whether appellant is seeking a compensatory or non-compensatory time extension.

The non-movant must cite specific materials in the record that we, as the fact finder could use to find in its favor and this appellant has failed to do. *See Optimum Corp. v. Emcore Corp.*, 603 F.3d 1313, 1319-1320 (Fed. Cir. 2010) ("When a party has failed to introduce evidence sufficient to establish the existence of an essential element of that party's case in accordance with the applicable standard of proof, summary judgment is properly granted against that party"), citing *Novartis Corp. v. Ben Venue Labs, Inc.*, 271 F.3d. 1043, 1046 (Fed. Cir. 2001). To establish its right to a time extension, appellant must show that the additional work involved lies on the critical path of the schedule. *Kinetic Builder's Inc. v. Peters*, 226 F.3d 1307, 1316-1317 (Fed. Cir. 2000) citing *Essex Electro Eng'rs, Inc. v. Danzig,* 224 F.3d 1283, 1295-96 (Fed.Cir. 2000), *Sauer Inc. v. Danzig,* 224 F.3d 1340, 1345-46 (Fed. Cir. 2000). In the three SUMF appellant denied, ¶¶ 107, 111 and 113, appellant referenced the backup it had submitted in early March 2015 in support of its proposal, which led to Modifications Nos.1G and 1H. This backup included fragnets, one of which includes an additional activity, 6-BO009 with a 70-day performance period extending from March 5, 2015 to May 13, 2015. Although the fragnet includes handwriting stating the addition of the fire alarm changes affects the critical path, the record includes nothing more than this conclusory assertion. There is no overall schedule, or logic submitted, which would explain how or why the addition of this work would affect the critical path. Even more problematic, appellant's continued reliance on its initial submission without more fails to even address, much less put into issue, the government's factual assertions, supported by documents in the record, that the work was completed by the end of March 2015, much more quickly than appellant contemplated at the time it prepared its proposal and the fragnets. On the record before us, the claim is implausible because appellant has failed to produce any evidence to counter the government's factual assertions. Appellant was required to produce persuasive evidence and has failed to do so. The record, when considered as a whole, could not be reasonably found to favor appellant. Although appellant, as the non-movant is entitled to have all reasonable inferences drawn in its favor, we find that the factual assertions of the government regarding when the additional work required was performed and how much time was involved, is unrebutted except with conclusory, unsupported assertions, which leave no reasonable inferences to be drawn for appellant. *See Matsushita Electric. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-587 (1986). Accordingly, we find SUMF ¶¶ 102-122 have been admitted and find the government is entitled to summary judgment with respect to this issue.

Issue 6: Repair of damages from basement flood

This issue involves repair costs for two flooding incidents and an increase to appellant's insurance premiums, which total $394,750.68, including $27,497.25 claimed for the increased insurance premiums (SOF ¶ 17 (6)). As noted above, appellant has withdrawn the insurance premium part of its claim. The government asserts the first flooding incident was caused by appellant, attributing it to a

16

cross-threaded pipe. (SUMF ¶¶ 135-137) Appellant has properly disputed the facts asserted by the government relating to the first flooding incident. It has submitted an affidavit from its president, Mr. Locke McKnight, in which Mr. McKnight asserts the government's work orders establish that other contractors were working on the plumbing in the area where the flooding occurred. The affidavit is accompanied by photographs, which Mr. McKnight asserts establish that someone other than appellant worked on the piping after appellant had finished its work. We find there is a factual dispute regarding the identity of the party responsible for the cross-threaded pipe, which makes this issue unsuitable for resolution by motion for summary judgment. Although this issue involves an additional flooding incident, because the costs have not been segregated and we have found there is a factual dispute regarding the first flooding incident, we need not address this additional flooding incident.

The government also asserts appellant has been paid for the costs appellant incurred associated with the flooding by its insurance company and is not obligated to repay same and that all of the evidence in the record suggests appellant does not hold the government responsible for the flooding (gov't mot. at 41-42; gov't reply at 13-14). Although not outlined in great detail, the government also argues appellant is not legally entitled to be paid twice for the same costs (gov't reply at 13-14). The government's assertions and argument ignore Mr. McKnight's assertion that the government is responsible for the flooding and the plain language of the settlement agreement between appellant and its insurance company, which requires appellant to repay the insurance company "to the extent GSC recovers from Roto-Rooter or *any other third person*." (SOF ¶ 22) (Emphasis added) This includes any potential recovery appellant may receive from the government and thus is consistent with appellant's assertion the government is responsible for the flooding. For all of the above stated reasons we deny the government's motion as it relates to this issue as modified by appellant's withdrawal of the increased premium portion of this issue.

Issue 7: Release of liquidated damages/contract balance

GSC seeks the payment of the outstanding contract balance. The government opposes, arguing it is undisputed it is entitled to liquidated damages in an amount exceeding the balance claimed. In support of its argument, the government asserts the contract provided for liquidated damages in the amount of $1,029.64 per calendar day, that the contract completion date as extended by modifications was February 15, 2015, and that the actual completion occurred June 19, 2015, or 124 days late, entitling the government to $127,675.36 in liquidated damages. (SUMF ¶¶ 163-172) Appellant admitted these facts, except it asserted the government has admitted substantial completion occurred on May 8, 2015, and took possession of the building on May 11,

17

2015.[15]  In its reply brief the government admits for purposes of the motion that substantial completion occurred on May 8, 2015 (gov't reply at 15).  The government states that appellant is entitled to a 21-day time extension for Issue No. 2, which extends the contract completion date to March 8, 2015 and that appellant, therefore, completed the project 61 calendar days late (*id*.).  The government argues it is thus undisputed that it is entitled to $62,808.04 (61 x $1,029.64) in liquidated damages.  The facts as revised by the government and appellant are undisputed and establish the government's right to liquidated damages in the amount of $62,808.04.  Accordingly, the government's motion is granted with respect to Issue No. 7 in this amount.

CONCLUSION

The government's motion is partially granted and partially denied as set forth above.

Dated:  June 4, 2020

CHRISTOPHER M. MCNULTY
Administrative Judge
Armed Services Board
of Contract Appeals

I concur

RICHARD SHACKLEFORD
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

I concur

OWEN C. WILSON
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

---

[15] Appellant also asserted the government took possession of Building 2833 as early as November 17, 2014 (SUMF ¶¶ 172, 174; Counter-Statement of Facts ¶ 10).  Although this assertion is supported by evidence in the record, *see* SOF ¶ 11, appellant argues the Board should use the date of May 8, 2015, as the date of substantial completion in reaching its decision (app. opp'n at 23).  We agree with appellant due to the HVAC system not working properly when the government took possession. *Kinetic Builder's Inc. v. Peters*, 226 F.3d 1307, 1315-16 (Fed. Cir. 2000) ("A project should be considered substantially completed when it is capable of being used for its intended purpose.")  We find that a building without a properly functioning HVAC system is not capable of being used for its intended purpose.

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA No. 61380, Appeal of GSC Construction, Inc., rendered in conformance with the Board's Charter.

Dated: June 5 2020

PAULLA K. GATES-LEWIS
Recorder, Armed Services
Board of Contract Appeals

19